UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DEANE BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 07-61-B-W |
| | ) |
| MARTIN MAGNUSSON, et al., | ) |
| | ) |
| Defendants | ) |

**RECOMMENDED DECISION ON
MOTION TO DISMISS/MOTION FOR SUMMARY JUDGMENT
(Docket No. 33)**

Deane Brown has brought a civil rights action against eight named defendants and five 'John Does.'

Mr. Brown alleges that defendants violated his First Amendment right to freedom of speech by refusing him access to the news media and by transferring him to the Maryland Correctional Adjustment Center ("MCAC") in Baltimore, Maryland in retaliation for his assertion of constitutionally and statutorily protected freedom of speech. Mr. Brown further alleges that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to inhumane and dangerous conditions at the Warren State Prison and repeatedly transferring him to the Administrative Segregation unit in retaliation for asserting his constitutional rights under the Eighth Amendment. Mr. Brown seeks injunctive and declaratory relief and compensatory and punitive damages.

(Compl. ¶ 2.) This recommended decision addresses a motion to dismiss, or in the alternative, for summary judgment brought by Defendants James O'Farrell, Deputy Warden at the Maine State Prison, and Jeffrey Merrill, Warden of the Maine State Prison (Doc. No. 33). Addressing this as a motion for summary judgment I recommend that the court grant judgment in favor of O'Farrell and Merrill.

*Discussion*

**Summary Judgment Standard**

"At the summary judgment stage," the United States Supreme Court explained in Scott v. Harris, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." __ U.S. __, __, 127 S. Ct. 1769, 1776 (2007) (citing Fed. Rule Civ. Proc. 56(c)). Scott reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). Brown cannot defeat summary judgment by relying on "'conclusory allegations, or rank speculation.'" Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007) (quoting Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir. 2006)).

      The facts material to the summary judgment motion are drawn from the parties' statements of material facts in accordance with District of Maine Local Rule 56. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). Brown is represented by counsel. In responding to the defendants' motion Brown

has filed a responsive memorandum (see Doc. No. 42) but no response to the defendants' statement of fact or a statement of additional facts.

Brown asserts in his response to this motion that the Court should be lenient citing to the following portion of Haines v. Kerner:

> Whatever may be the limits on the scope of inquiry of courts into the internal administration of prisons, allegations such as those asserted by petitioner, however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence. We cannot say with assurance that under the allegations of the pro se complaint, which we hold to less stringent standards than formal pleadings drafted by lawyers, it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' Conley v. Gibson, 355 U.S. 41, 45-46 (1957). See Dioguardi v. Durning, 139 F.2d 774 (CA2 1944).

404 U.S. 519, 520-21(1972).

Perhaps recognizing that Haines is a case addressing a pro se complaint, Brown's Maine counsel represents that she has had limited access to her client due to his transfer to Maryland. (Opp'n Mem. at 2.)  There are two glaring weaknesses with this argument. First, this is not a motion to dismiss, this is a motion for summary judgment and this is Brown's "opportunity to offer supporting evidence."  Second, in terms of his supporting evidence, Brown has submitted a 126 paragraph affidavit and a three paragraph addendum and there is no reason that Brown's distance from his Maine attorney would have prevented counsel from complying with the local rule by submitting a paragraph by paragraph response to the defendants' statement of fact with record citations to the Brown affidavit and/or generating a statement of additional facts with record citations to the affidavit that would have given the defendants an opportunity to respond to Brown's facts in a reasonable manner.  Compare See Clarke v. Blais, 473 F. Supp. 2d 124, 128 (D. Me. 2007) (incorporating pro se litigant's affidavit testimony despite non-compliance with Local Rule 56).  As it stands, there is no reason to expect these defendants to respond to each

3

paragraph of the Brown affidavit as if it were a statement of fact or to attempt to identify which of the affidavit statements are material to Brown's opposition. Accordingly, I proceed to analyze the merits of this motion on the basis of the facts set forth by the defendants, treating them as undisputed.

## *Defendants' Material Facts*

Defendant O'Farrell is the Deputy Warden for Security at the Maine State Prison and has been since July of 2002. (SMF ¶ 1.) O'Farrell is the person who ordered Deane Brown placed in administrative segregation on October 24, 2006. (Id. ¶ 2.) O'Farrell did not order Brown placed on a suicide watch or any 24-hour watch at any time or otherwise have anything to do with his placement on any such watch. (Id. ¶ 3.) The reason O'Farrell ordered Brown placed in administrative segregation on October 24, 2006, was that, based on information he had acquired as a result of several investigations, he considered that Brown might be a threat to the security and orderly management of the Maine State Prison and that Brown needed, therefore, to be confined in administrative segregation until O'Farrell's investigation of Brown's threat could be completed. (Id. ¶ 4.)

Approximately one month before, O'Farrell was told by one of the Prison's criminal investigators, Karen Anderson, that it had been discovered that prisoners were accessing the internet through Law Library computers but that the "hole" had been fixed soon after it was discovered. (Id. ¶ 5.) O'Farrell was also told that there was an ongoing investigation into computer software and attempts to smuggle disks into the prison. (Id. ¶ 6.) Approximately two weeks later, O'Farrell was told that Ms. Anderson had received information that prisoners might be breaking into the office of one of the Prison's teachers, Diane White. (Id. ¶ 7.) This made O'Farrell think that a break-in might be for the purpose of accessing Ms. White's computer. (Id.

4

¶ 8.)  O'Farrell was also told that when Ms. Anderson and a sergeant had then gone to check the door they had discovered that it had been jammed with a piece of wood to prevent it from being opened.  (Id. ¶ 9.)  This made O'Farrell think that the door was being jammed so that staff could not enter the office easily while the computer was being accessed.  (Id. ¶ 10.)  O'Farrell was also told that Ms. Anderson had then positioned an officer in a closet to secretly observe the office.  (Id. ¶ 11.)  On October 14, 2006, O'Farrell received a copy of the report of the officer, Steven Wigdzinski.  (Id. ¶ 12.)  In that report, it was said that Brown and another prisoner had gone to the education department and had tried to break into Diane White's office.  (Id. ¶ 13.)

On October 22, 2006, O'Farrell received information that an unnamed prisoner was planning an escape from the prison by having a gun brought into him in a few days.  (Id. ¶ 14.)  O'Farrell then started an investigation into this.  (Id. ¶ 15.)  On October 23, 2006, O'Farrell was told during a confidential interview that Deane Brown was involved in the escape plan and that his part was to open the doors with his locksmith capabilities.  (Id. ¶ 16.)  O'Farrell also was told that Brown had received information taken from the Prison's computers, including information on Prison security systems and information on the Inmate Benefit Fund (IBF) account.  (Id. ¶ 17.)  By then, O'Farrell had also determined that prisoner Gary Watland was likely the person planning the escape.  (Id. ¶ 18.)  O'Farrell knew that Brown and Watland had had many opportunities to speak with one another since they were both general population prisoners and would have had the chance to go to recreational activities, programs, and dining hall together and could meet in other places, like the medical area.  (Id. ¶ 19.)  On October 24, 2006, at approximately 12:30 p.m., the wife of Watland, who was scheduled to visit with Watland that day, was intercepted in the prison parking lot, as she stepped out of her car, with a gun on her person.  (Id. ¶ 20.)

It was based on all this information that O'Farrell ordered Brown to be placed into administrative segregation later that day. (Id. ¶ 21.) The next day, O'Farrell interviewed Brown. (Id. ¶ 22.) Brown denied going to the education department on October 14, 2006. (Id. ¶ 23.) Brown also said that a captain had given him the IBF account information, something which O'Farrell knew the captain would never do. (Id. ¶ 24.) On October 26, 2006, O'Farrell received a report from officer Robert Moore that at approximately noon on October 24, 2006, Brown had said to Moore in the dining hall "An atomic bomb is about to hit this place." (Id. ¶ 25.) O'Farrell didn't know whether Brown knew that Watland had been taken to administrative segregation earlier that day. (Id. ¶ 26.)

On October 30, 2006, O'Farrell interviewed Brown again and obtained from Brown a signed statement. (Id. ¶ 27.) In this statement, Brown admitted that he was in the area of Diane White's office. (Id. ¶ 28.) Brown claimed it was for the purpose of proving to another person that he could not unlock the door. (Id. ¶ 29.) O'Farrell considered this an admission that Brown had tried to unlock the door. (Id. ¶ 30.) Also in this statement, Brown admitted that a day or two before the escape attempt, Brown had accepted from another person a website address described to Brown as being for the Maine Department of Corrections files for every prisoner and Brown admitted that he had committed it to memory. (Id. ¶ 31.) O'Farrell considered Brown's admission of memorization an admission that Brown intended to use the address. (Id. ¶ 32.) Brown claimed that he had done this to report to a newspaper correspondent that the department's computer system's integrity had been breached and that Brown had intended to ask for the website address to be returned by the reporter without the reporter's breaching the system. (Id. ¶ 33.) O'Farrell considered this an admission that Brown was planning to give the address to an outsider knowing that person could use it because merely asking someone not to is no

6

assurance it would not be.  (Id. ¶ 34.)  O'Farrell did not believe any of Brown's denials in his statement.  (Id. ¶ 35.)

It was based on all this information, including the information that had caused O'Farrell to have Brown placed into administrative segregation, as well as other information about Brown's history, upon which O'Farrell based his recommendation to the Warden, on November 2, 2006, that Brown be immediately transferred out of state for the security, safety, and orderly management of the Maine State Prison.  (Id. ¶36 .)  Included in Brown's history was a 1984 report from a New Hampshire sheriff that the sheriff had never seen such a dangerous prisoner or one with the locksmith capabilities of Brown.  (Id. ¶ 37.)  Also, there was a report that on January 7, 2004, Brown had a homemade screwdriver and that caulking had been removed from around his cell window.  (Id. ¶ 38.)  Also, there was a report that on April 12, 2005, Brown had other contraband, possibly to be used to install speakers into electronic equipment.  (Id. ¶ 39.)  Also, there was a report that on July 15, 2005, Brown had released himself from his handcuffs and had taunted an officer about it.  (Id. ¶ 40.)  Also, there was the letter dated October 17, 2006, from the Warden indicating that Brown had been giving confidential information to the news media.  ((Id. ¶ 41.)  Also, there were other incidents in his history dating back to 1981.  (Id. ¶ 42.)

In ordering Brown placed in administrative segregation and recommending his transfer out-of-state, O'Farrell never once considered anything about any grievances Brown had filed.  (Id. ¶ 43.)  Also, except for the fact that Brown had been and was planning to continue providing confidential information to the news media, as set out above, O'Farrell did not consider anything about Brown's relationship with the news media.  (Id. ¶ 44.)  When recommending Brown's

7

transfer, O'Farrell considered Brown to be one of the greatest threats ever to the security of the prison. (Id. ¶ 45.)

Defendant Merrill is the Warden of the Maine State Prison and has been for over 12 years. (Id. ¶ 46.) It was based on all the information he had received from the Deputy Warden, as set out above, that Merrill accepted his recommendation that Brown be transferred out of state and that Merrill had a request put into the Department of Corrections that Brown be transferred. (Id. ¶ 47.) Merrill asked that the transfer be expedited because he considered Brown one of the most serious threats to the security of the Prison that he had ever experienced. (Id. ¶ 48.) In doing this, Merrill never once considered anything about any grievances Brown had filed. (Id. ¶ 49.) Also, except for the fact that Brown had been and was planning to continue providing confidential information to the news media, Merrill did not consider anything about Brown's relationship with the news media. (Id. ¶ 50.) Merrill did order Brown to be placed on a 24 hour watch pending his transfer after he was told that he had been removed from the suicide watch that the mental health staff had put him on as well as the 15 minute logged watch they had put him on. (Id. ¶ 51.) This watch was not a suicide watch but was an administrative constant watch and in ordering this Merrill considered only the threat posed by Brown and his locksmith skills. (Id. ¶ 52.) Merrill did not feel that anything less than a constant watch by officers sitting directly in front of Brown's cell would assure that he would not escape his cell at least. (Id. ¶ 53.)

### *Recommended Disposition*

In responding to this dispositive motion, Brown clarifies: "Defendant Merrill, Defendants are exactly correct that Plaintiff is alleging retaliatory motivation as to his multiple placements in Administrative Segregation and ultimate transfer to Maryland." (Opp'n Mem. at 2-3.) He opines:

> With regard to the Plaintiff's placement in special solitary confinement in October, 2006 and his subsequent transfer to Maryland, Defendants Merrill and O'Farrell claim they considered the Plaintiff "one of the greatest threats ever to the security of the Prison," (Doc. 35, ¶ 7; see also Doc. 36 ¶ 3). This claim is encased in a cloud of disputed material facts. To begin with, according to the Plaintiff, his prior placements on administrative segregation for possession of contraband involved charges which were later determined by prison internal review to have substantive and procedural faults, while Plaintiff disputes the basis for placing him in administrative segregation based on the same charges which were dismissed in the disciplinary hearing, a sort of administrative double jeopardy. (See Plaintiff's Affidavit, ¶¶ 29-69). Indeed, the picture that emerges from these actions is that of a prison administration targeting Plaintiff for his advocacy and protected First Amendment activities, rather than because he was an escape risk or security threat, which he was not. (See Plaintiff's Affidavit, ¶¶ 28, 41, 60)
>
> The Defendants' claims that Plaintiff was somehow involved in Gary Watland's hacking into the prison computer system, and his subsequent plan to escape from prison by having his wife sneak in a gun during visiting hours, are similarly clouded in disputed material facts. According to Plaintiff, he had never met Watland prior to the escape attempt, and had no knowledge of Watland's activities. (See Plaintiff's Affidavit, ¶¶ 1- 27, for a detailed account addressing the situation.) Moreover, the Watland incident, with its breaches of security both in cyberspace and in the prison itself, could have proved a major embarrassment to the Defendants. It presented an ideal pretext to ship a reliable source of information far away from the state news media, at the very time when a potentially damaging story was breaking. Finally, Plaintiff offers direct sworn testimony in his affidavit of retaliatory intent by Defendant O'Farrell, who told him soon after his placement on administrative segregation in October, 2006, "You should have kept your mouth shut. I have some place special for you. We'll see how your ass feels after those niggers are done with you." (See Plaintiff's Addendum to Affidavit, ¶ 127).

(Id. at 4-5.)  This argument is all well and good but there are no cognizable facts supported by record citations to support the assertions of retaliatory intent.  Creating argumentative 'clouds' is not a tenable alternative to summary judgment practice in this District in cases in which both sides are counseled.

A plaintiff pressing a claim of retaliatory segregation or transfer in defense of a summary judgment motion must produce evidence that the decision was not made because of a violation of prison rules, see Johnson v. Hamilton, 452 F.3d 967, 973 (8th Cir. 2006) ("If the discipline

9

which a prisoner claims is retaliatory was in fact imposed for an actual violation of prison rules or regulations, the prisoner's claim must fail. Johnson was given a disciplinary hearing for each conduct violation. Evidence was presented in support of those violations, and Johnson has not come forward with any evidence that the prison officials were motivated solely by an intent to retaliate against him."), or, in other words, the action was not taken for "legitimate reasons," Layne v. Vinzant, 657 F.2d 468, 47 (1st Cir. 1981) ("The mere chronology alleged in the complaint, while sufficient to withstand a motion to dismiss, cannot get plaintiff to the jury once defendants have produced evidence of a legitimate reason. A contrary rule would take away the "wide latitude afforded prison officials in ordering transfers," by effectively insulating from transfer the inmate who once files a complaint against prison officials.") (citations omitted); See also Gomes v. Fair, 738 F.2d 517, 525 (1st Cir. 1984) ("We agree that the issue for a court in a case like this is limited to whether the prison officials were acting in a good faith and reasonable belief that the restrictions they were imposing were necessary."); accord Shabazz v. Cole, 69 F.Supp.2d 177, 198 (D. Mass. 1999). With regards to the retaliatory transfer claim, the First Circuit explained in McDonald v. Hall that a plaintiff faces,

> a substantial burden in attempting to prove that the actual motivating factor for his transfer was as he alleges. See Laaman v. Perrin, 435 F.Supp. 319, 328 (D.N.H.1977). Plaintiff must prove that he would not have been transferred "but for" the alleged reason. See Mount Healthy City Board of Ed. v. Doyle, 429 U.S. 274 (1977). Moreover, the requirement of a "but for" showing together with the wide latitude afforded prison officials in ordering transfers may make summary judgment particularly appropriate.

610 F.2d 16, 18 -19 (1st Cir. 1979). See also Layne, 657 F.2d at 47 n.14 ("With respect to this ilk of claims, 'what will do on motion to dismiss will not satisfy a plaintiff's ultimate burden of production.'"). This summary judgment motion was Brown's opportunity to meet his substantial burden of making his 'but for' showing. He has not done so and Defendants Merrill and O'Farrell

have made a showing that the decisions to segregate and transfer him were motivated by grave concerns for institutional safety. They are entitled to summary judgment on his retaliatory segregation and transfer claims.

> Brown also adds in his opposition memo:
>
> In addition, Defendants' motion fails to even mention Merrill's denial of Plaintiff's First Amendment rights by his refusal to permit the Plaintiff access to the press and his support and enforcement of a blanket prohibition on inmates becoming press correspondents. See Complaint ¶¶ 54, 56, 58, 59, and Attached Exhibits. It is essential for the Plaintiff to be able to submit evidence about the motivation behind this policy, on its face, as well as the motivation behind the policy as applied to the Plaintiff.
> …
> The issues raised about the blanket ban on inmates acting as correspondents, as well as on the Plaintiff's general access to the media, is a material question of fact that must be determined by the trier of fact.

(Id. at 4, 5) Count I of the complaint alleges:

> Mr. Brown, a jailhouse correspondent, was ordered to cease his communication with the media, an order made without justifiable cause. Furthermore, he was informed that under Departmental policy, "[a] prisoner may not act as a reporter, publish under a byline or act as an agent of the news media," in violation of the First and Fourteenth Amendments and 42 U.S.C. § 1983.

(Compl. ¶ 72.) The defendants have not addressed this aspect of Brown's complaint or his related argument in his opposition memorandum. However, as discussed in my recommended decision on the defendants' motion for summary judgment on non-exhausted claims (Doc. No. 28) Brown has not exhausted this claim as required by 42 U.S.C. § 1997e(a).

Finally, I add that this recommendation, if adopted, would result in any remaining claims under Count II against Defendant Martin Magnusson, the Commissioner of the Maine Department of Corrections who is sued in his supervisory capacity, being dismissed because Brown has not generated a genuine dispute of material fact that Merrill (or O'Farrell) violated Brown's right, a showing that is an essential predicate to holding him liable as a supervisor.

11

*Conclusion*

For the reasons set forth above, I recommend that the Court grant this motion for summary judgment and, additionally, that the one remaining claim against Magnusson based upon a claim of supervisory liability should likewise be dismissed.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed without ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Date: September 3, 2008